DECISION
{¶ 1} Relator, Gina Coffman, the mother and guardian of the estate of Lauren M. Coffman, a minor, filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("the commission") to vacate its order denying an additional award for a violation of a specific safety requirement ("VSSR"), and to enter an order granting such an award, in connection with the death of relator's husband, Brian Coffman ("the decedent"), who died as the result of a work-related injury.
 {¶ 2} Pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth District Court of Appeals, the matter was referred to a magistrate of this court. On December 22, 2004, the magistrate rendered a decision, including findings of fact and conclusions of law, and therein recommended that this court grant a writ ordering the commission to vacate its order denying the VSSR application and to enter a new order that adjudicates the VSSR application in a manner consistent with the magistrate's decision. (Attached as Appendix A.) Respondent, The Lincoln Electric Company, timely filed objections to the magistrate's decision, which are now before the court.
 {¶ 3} This case arises out of an incident in which decedent was electrocuted while removing electrified "alligator clips" from a welding machine he had just finished testing. It is undisputed that decedent was not wearing insulated gloves or other protective gear, and had not been provided with any such gear. It is also undisputed that respondent had instructed decedent to turn off the power to the alligator clips prior to removing them from each welding machine tested. The testing board contained green and red flashing lights, which would flash when the power was activated. When the testing board was dark, this indicated that the power was off. There is no indication that the flashing warning lights malfunctioned or failed to function on the testing board that decedent was using when he died. According to the police report taken at the scene, as well as decedent's supervisor's report and the testimony of a coworker, it is probable that decedent simply forgot to turn off the power to the leads before he touched them.
 {¶ 4} The specific safety requirement at issue in this case is found at former Ohio Adm. Code 4121:1-5-23(A),[1] which provides:
Unless the electrical conductors or equipment to be worked on are isolated from all possible sources of voltage or are effectively grounded, the employer shall provide protective equipment approved for the voltage involved, such as rubber gloves with protectors, rubber sleeves, hot line tools, line hose, line guards, insulator hoods, blankets, and access boards. Employees shall be instructed in the use of such tools and equipment and, when working on or when working within contact distance of an energized conductor, shall use such tools and equipment.
 {¶ 5} The commission found that respondent had not violated the above requirement, and that decedent's unilateral negligence was the sole cause of his death. More specifically, the commission determined that the safety procedures that respondent had instituted (flashing lights indicating that power is on, and an instruction to employees to turn off the power prior to touching the alligator clips) would have prevented the accident had decedent followed such procedures. The commission found that respondent's safety procedures eliminated the need for the provision of protective gloves or other equipment.
 {¶ 6} The instant mandamus action is premised upon relator's assertion that the commission abused its discretion in applying the doctrine of unilateral negligence. The magistrate found that the doctrine of unilateral negligence has no application to this case, and that respondent had in fact violated former Ohio Adm. Code 4121:1-5-23(A) by impermissibly shifting to the decedent the duty to ensure that the equipment decedent was working on was isolated from all possible sources of voltage.
 {¶ 7} The magistrate noted that the duty to provide a safe working environment always remains with the employer, and that the doctrine of unilateral negligence only applies when the employer has first complied with the applicable safety requirement and the employee "deliberately renders an otherwise complying device noncompliant or nonconforming."State ex rel. Quality Tower Serv., Inc. v. Indus. Comm. (2000),88 Ohio St.3d 190, 192, 724 N.E.2d 778. The court in Quality Tower noted that specific safety requirements subject employers to liability only for acts within the employer's control, and do not impose a duty of constant surveillance upon the employer. Ibid., citing State ex rel. Frank Brown Sons, Inc. v. Indus. Comm. (1988), 37 Ohio St.3d 162, 164,524 N.E.2d 482.
 {¶ 8} In its objections, respondent argues that the magistrate's conclusion that the unilateral negligence doctrine is inapplicable does, in effect, impose a duty of constant surveillance. In respondent's view, once it has given an employee specific instruction in safety procedures which will, if followed, keep the employee safe even without protective gear, it should not be required to constantly monitor the employee to ensure he is following those procedures.
 {¶ 9} Respondent directs our attention to the opinion in QualityTower, supra, where the Supreme Court of Ohio explained that, under the doctrine of unilateral negligence, "[t]he employer * * * avoids VSSR liability when `[the] employee unilaterally violates a safety requirement [emphasis added],' that is, when the employee * * * ignores * * * [an] instruction that complies with a specific safety requirement." QualityTower, supra, at 193. (Citations omitted.) According to respondent, because decedent ignored respondent's instruction that, if followed, would have protected decedent from the danger of electrocution, the doctrine of unilateral negligence is a complete defense to VSSR liability in this case. We disagree.
 {¶ 10} The discrete issue to which respondent's objections clearly resolve is this: Does the giving of an instruction to an employee to de-energize the equipment being worked on prior to touching such equipment constitute compliance, in the first instance, with former Ohio Adm. Code 4121:1-5-23(A)? We hold that it does not. An examination of the plain language of former Ohio Adm. Code 4121:1-5-23(A) reveals that the specific duty imposed on the employer is not to ensure that the equipment to be worked on is isolated from all voltage, as respondent urges.
 {¶ 11} The duty imposed upon an employer by the plain language of former Ohio Adm. Code 4121:1-5-23(A) is the duty to provide protective equipment for use in all instances where the equipment to be worked will not be isolated from all possible sources of voltage. The pertinent language is as follows: "Unless the * * * equipment to be worked on [is] isolated from all possible sources of voltage * * * the employer shallprovide protective equipment approved for the voltage involved * * *." (Emphasis added.) In other words, should there arise any instance where the equipment to be worked on by the employee will not be isolated from all possible sources of voltage (which is exactly what occurred in this case) then the employer has a duty to provide appropriate protective equipment for the employee's use. The employer avoids liability not by isolating the equipment from all sources of voltage, but by providing protective equipment.
 {¶ 12} Therefore, we hold that an employer cannot comply with former Ohio Adm. Code 4121:1-5-23(A) merely by instructing its employees in a procedure to isolate the equipment to be worked on from all possible sources of voltage. The employer must, as required by the plain language of the regulation, provide protective equipment should there be any possibility that an employee will encounter equipment to be worked on that is not so isolated. The evidence undisputedly demonstrates that respondent did not provide such equipment in the present case and, therefore, did not comply with the applicable safety requirement.
 {¶ 13} The doctrine of unilateral negligence is inapplicable where, as here, the employer has not complied with the safety requirement in the first instance. Thus, we need not determine whether decedent deliberately rendered an otherwise compliant safety measure noncompliant. See State exrel. Quality Tower Serv., Inc. v. Indus. Comm. (2000), 88 Ohio St.3d 190,192, 724 N.E.2d 778.
 {¶ 14} Because the evidence establishes that respondent did not comply with the duty to provide protective equipment imposed by former Ohio Adm. Code 4121:1-5-23(A), and that such failure to provide equipment was the proximate cause of decedent's injury and death, we find that the commission's order denying the application for a VSSR award was an abuse of discretion.
 {¶ 15} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of respondent's objections, we overrule the objections, and find that the magistrate made no error of fact or law. We adopt the magistrate's decision as our own, including the findings of fact and conclusions of law therein, and supplement the magistrate's decision with our own conclusions of law discussed in this decision. We grant the requested writ of mandamus and order the commission to vacate its order denying relator's application for a VSSR award, and to enter a new order that adjudicates the VSSR application in a manner consistent with this decision.
Objections overruled; writ of mandamus granted.
Brown, P.J., and Petree, J., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
The State of Ohio ex rel. :
Gina Coffman, Mother Guardian of :
The Estate of Lauren M. Coffman, :
a Minor, :
Relator, :
 :
v. : No. 04AP-303
 : (REGULAR CALENDAR)
The Industrial Commission of Ohio :
and The Lincoln Electric Company, :
 Respondents. :

MAGISTRATE'S DECISION
Rendered on December 22, 2004.
Ward, Kaps, Bainbridge, Mauer Melvin, Thomas L. Steele and WilliamJ. Melvin, for relator.
Jim Petro, Attorney General, and Dennis L. Hufstader, for respondent Industrial Commission of Ohio.
Duvin, Cahn Hutton, Kenneth B. Stark and Patricia A. Conti, for respondent The Lincoln Electric Company.
 IN MANDAMUS {¶ 16} In this original action, relator, Gina Coffman, the mother and guardian of the estate of Lauren M. Coffman, a minor, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying an additional award for alleged violations of specific safety requirements ("VSSR") in connection with the death of Brian Coffman who was electrocuted on January 5, 2000, while employed with respondent The Lincoln Electric Company, and to enter an order granting a VSSR award.
Findings of Fact:
 {¶ 17} 1. On January 5, 2000, Brian Coffman ("decedent") was electrocuted while testing a welder in the course of his employment with respondent The Lincoln Electric Company ("Lincoln Electric"), a self-insured employer under Ohio's workers' compensation laws.
 {¶ 18} 2. On October 16, 2000, Gina Coffman, the mother and guardian of Lauren M. Coffman ("Lauren"), filed a death claim on behalf of Lauren, who was two years of age on the date of her father's death.
 {¶ 19} 3. Following a December 8, 2000 hearing, the commission allowed the death claim and found Lauren to be wholly dependent upon decedent at the time of his death. The commission ordered Lincoln Electric to pay monthly compensation to Lauren through her mother and guardian until Lauren reaches her 18th birthday.
 {¶ 20} 4. On December 28, 2001, a VSSR claim was filed on behalf of Lauren by Gina Coffman.
 {¶ 21} 5. The VSSR claim prompted an investigation by the Safety Violations Investigation Unit ("SVIU") of the Ohio Bureau of Workers' Compensation. The SVIU report was completed on May 22, 2002. The SVIU investigation produced a multitude of exhibits including a report from the Euclid, Ohio Police Department, a videotape produced by Lincoln Electric that demonstrates the procedures for testing the welders, and the findings of an investigation conducted by the Occupational Safety and Health Administration.
 {¶ 22} 6. The VSSR claim was heard by a staff hearing officer ("SHO") on January 13, 2003. The hearing was recorded and transcribed for the record.
 {¶ 23} 7. At the hearing, relator's counsel theorized how the accident occurred based upon the exhibits of record:
[Decedent] did the final inspection and testing of these machines I guess after they had been manufactured by Lincoln Electric Company, the assembly line process and the last point on the assembly line is to test the welders. And that was [decedent's] job, to work a testing panel and test these welders. And what [decedent] would do would be to hook up power from the testing panel to the welder to be tested, he would do that using three leads or wires, what is known as alligator clips, and there are a lot of photographs in the investigation report of these alligator clips that were used then to connect the testing panel to the welder to be tested.
As I understand it, the proper procedure would be to shut off all the power and then attach the alligator clips to the welder. [Decedent] would then do a series of tests on that particular welder. Then [decedent] would — should have shut the power off and then disconnected the alligator clips and that would have been the proper way to conduct that testing of the welder.
Now, the police report speculates that [decedent] may have failed to turn off the power before he disconnected the alligator clips from the welder that he had tested after he had run the series of tests. If that is true, then [decedent] would have had the two leads, one lead in each hand and they would have still been live and he would have been obviously electrocuted in that manner. [Decedent] would have taken 575 volts which the report states would have been more than enough to have killed him. So that's a speculation from the police department as to what happened. This would seem to be consistent with the statement of the witness, Jerry Rettenbach. The company took his statement on the day of the accident and it is Exhibit Number 1 in the investigation report.
I think the explanation of the police report also appears to be consistent with the autopsy report which was referred to in the police supplementary report and indicates that there were burn marks on both of [decedent's] hands when the autopsy was done which would also indicate that he had been burned on each hand and that was apparently the source of the electrocution. And finally there's a supervisor's report of the accident as well, in the investigation report, and that's Exhibit Number 4 and the supervisor in a rather brief summary concluded that [decedent] had finished up his tests of the welder and that he was removing the input leads or the alligator clips with the power still on and that's what caused his death.
There's no evidence in the investigation report anywhere that the claimant was wearing insulated gloves or that the employer had provided any insulated gloves to him to use while he was testing these welders. The investigator notes that the burns on his hands would suggest that he was not wearing gloves. No gloves were found. I think it's clear that the employer did not provide gloves to [decedent] on this particular job. I'm not sure that that's been denied by the employer as well with the investigation we have so far.
(Tr. 11-14.)
 {¶ 24} 8. At the January 13, 2003 hearing, Glenn Drotar, a 23-year employee of Lincoln Electric, testified on behalf of Lincoln Electric. The videotape was played at the hearing so that Drotar could comment on the testing procedure. Drotar trained decedent on how to perform welder testing for Lincoln Electric. Drotar testified that two lights, one red and one green, flash on top of the "test board" when there is electrical power flowing to the welder.
 {¶ 25} 9. During Drotar's testimony, the following exchange occurred between Lincoln Electric's counsel and Drotar:
[Lincoln Electric's counsel]: You have testified that you have trained testers in the past; is that right?
[Drotar]: Yes.
[Lincoln Electric's counsel]: Did you train [decedent]?
[Drotar]: Yes.
[Lincoln Electric's counsel]: What did you train the testers that you've trained as far as making sure the power is off?
[Drotar]: We emphasize the fact that the lights, the test board should be dark when you reach into that machine or when you unplug those input leads. You double-check, triple check, anything you have to do. * * *
* * *
[Lincoln Electric's counsel]: Prior to the accident, did you believe that there was a need to wear rubber gloves while you were performing the test?
[Drotar]: No.
[Lincoln Electric's counsel]: Why not?
[Drotar]: We were never exposed to electricity. We were trained to make sure everything was shut off.
* * *
[Lincoln Electric's counsel]: How many welders are tested on a given day?
[Drotar]: Anywhere from 25 to 45.
[Lincoln Electric's counsel]: Per day?
[Drotar]: Yes.
[Lincoln Electric's counsel]: So how many welders over a three year period would [decedent] have tested?
[Drotar]: Thousands.
(Tr. 56, 62-65.)
 {¶ 26} 10. During cross-examination of Drotar by relator's counsel, the following exchange occurred:
[Relator's counsel]: And while you're testing a welder, there are energized parts, are there not?
[Drotar]: While we're testing? Inside the welder, yes, there are.
[Relator's counsel]: Aren't those alligator clips, those are also hot, are they not?
[Drotar]: Yes.
[Relator's counsel]: We can see right there on the video you were only standing maybe two, three feet away from those?
[Drotar]: Yes.
[Relator's counsel]: Energized alligator clips?
[Drotar]: Yes.
[Relator's counsel]: So if you were to — while conducting the test, if you were to have touched those alligator clips you would have been electrocuted, anywhere from 230 to 575 volts; is that correct:
[Drotar]: Yes.
[Relator's counsel]: And that's every time you're testing a welder there is exposure to a live part; is there not?
[Drotar]: I don't understand what you're saying. Exposure to —
[Relator's counsel]: Exposure to the live alligator clip —
[Drotar]: — to me touching it, no.
[Relator's counsel]: There's a possibility that you could touch that live part, the alligator clip, you could touch that potentially every time you're testing a welder because it's exposed, it's not covered?
[Drotar]: If I made a mistake and didn't shut the power off, yes.
[Relator's counsel]: Didn't shut the power off. What if you slipped or tripped over something and reached your hand out to catch yourself, could you not have possibly touched those live alligator clips?
[Drotar]: Sure, yes.
[Relator's counsel]: Okay. Isn't it possible, as many times as you have to turn the power off and on for every welder and say for every shift where you're doing 25 or 40 welders, isn't it also possible an operator could forget to shut the power off?
[Drotar]: Yes.
(Tr. 67-69.)
 {¶ 27} 11. During final argument at the hearing, Lincoln Electric's counsel argued:
The standard that is at issue here provides that personal protective equipment is only required where the equipment is not isolated from sources of electricity. And the safety procedure that [decedent] was trained on, Mr. Drotar testified to, Mr. Drotar worked on himself for many years, always required that electrical current to be turned off before touching or coming close to those conductors. That was a safety procedure. * * *
There are some intentional acts of employees that simply can't be explained. In this case, the company not only trained [decedent], provided an assured method in order to determine whether the power was on, he was instructed only to come near those conductors when the power is off and for some reason he didn't do it on this occasion. * * *
It was only [decedent's] own act that resulted in the fatality[.] * * *
(Tr. 70-71.)
 {¶ 28} 12. Lincoln Electric's counsel further argued:
Yes. I think there can be little doubt that from the thousands of time[s] [decedent] did this job, he did it in compliance with the safety requirements of the Industrial Commission. In other words, when you hit that off button, the equipment is isolated from all possible sources of voltage and when [decedent] hits that button and is trained to hit that button, the safety requirements are complied with. It was only his not following the instructions that resulted in there being a possibility of voltage.
(Tr. 75.)
13. Following the January 13, 2003 hearing, the SHO issued an order denying the VSSR application. The SHO's order states:
The Hearing Officer finds that the decedent/claimant worked as a tester of welding machines for the instant employer for approximately 10 years. Mr. Drotar, a Lincoln Electric Company employee, and the person who instructed the decedent/claimant as to the proper procedure to test the welding machines that had just come from the assembly line, outlined the proper way to test said machines and indicated he instructed the decedent/claimant for approximately one month in said procedure. The Hearing Officer finds that there is no dispute that during the time the decedent/claimant was a tester that he tested thousands of welding machines without mishap.
The Hearing Officer viewed a video tape of the procedure which indicated that when the power was turned on to the testing board and the welding machines to be tested, that red and green lights would be flashing on the testing board as well as dials that would have lit up when the power was on. When the machine was off and isolated from all power, the lights on the board would not be flashing and the dials on the board were dark.
Mr. Drotar testified that the use of rubber isolated gloves were not needed, in that once the machine had power, there was no need to handle the machine. He stated at hearing that prior to supplying power to the machine, alligator clips are attached to the machine, a voltage is selected, and the testing board is turned on supplying the welder with power. According to the witness, the lights on the board begin flashing and the dials light up, indicating that the machine is energized.
Mr. Drotar testified that to discontinue the test, the power on the board is turned off which isolates the machine from power. All lights and dials are dark.
The decedent/claimant was electrocuted when he grabbed the alligator clips off of the machine while power still ran to the machine. Evidence in file showed that the decedent/claimant had burn marks in the palm of his hands at the time of his death, indicating he was holding the alligator clips.
Counsel for the widow/claimant states that the code sections he contends the employer has violated are 4121:1-5-23(A) and 4121:1-5-17(C)(1) and 4121:1-5-17(I)(4).
4121:1-5-23(A) — Unless the electrical conductors or equipment to be worked on are isolated from all possible sources of voltage or are effectively grounded, the employer shall provide protective equipment approved for the voltage involved, such as rubber gloves with protectors, rubber sleeves, hot line tools, line hose, line guards, insulator hoods, blankets, and access boards. Employees shall be instructed in the use of such tools and equipment and, when working on or when working within contact distance of an energized conductor, shall use such tools and equipment.
4121:1-5-17(C)(1) — Personal protective equipment furnished by the employer shall be issued to the employee in sanitary and proper condition so that it will effectively protect against the hazard involved.
4121:1-5-17(I)(4) — When an employee is required to work on, or in proximity to, energized lines, the employer shall provide and the employee shall use protective equipment approved for the hazard involved.
Pursuant to the employer's witness Mr. Drotar, and the undisputed evidence that the claimant did the procedure thousands of times testing welding machines, the claimant neglected to turn off the power at the testing board prior to his handling of the alligator clips and electrocuted himself. This was an unfortunate accident but not one caused in any way by the employer.
The Staff Hearing Officer finds that the code sections that the decedent/claimant's representative has based the action on do not apply, in that if the claimant had followed the procedure he had done thousands of times prior to 1/5/2000, and turned off the power at the welding testing board prior to handling the energized alligator clips, this unfortunate accident would not have occurred.
The Hearing Officer finds that pursuant to evidence testified to and shown by video, the employer had sufficient and proper safe guards in place that would have spared the decedent/claimant had he followed them. The Hearing Officer finds that said safety procedures isolated the welder from all possible sources of voltage, eliminating the need for protective gloves or equipment.
The Hearing Officer finds that due to the unfortunate negligence of the decedent/claimant, he was the cause of his demise and it was not the fault of the employer.
Therefore, the decedent/claimant's application for a finding of a violation of a specific safety requirement is DENIED.
(Emphasis sic.)
 {¶ 29} 14. Relator moved for rehearing pursuant to Ohio Adm. Code4121-3-20(C). The commission denied rehearing.
 {¶ 30} 15. On March 22, 2004, relator, Gina Coffman, mother and guardian of the estate of Laura M. Coffman, a minor, filed this mandamus action.
Conclusions of Law:
 {¶ 31} The commission found that decedent was negligent in failing to turn off the power at the testing board before handling the energized alligator clips. The commission found that decedent's failure to perform this procedure as he had been instructed by his employer, and had performed many times before, was the cause of his death and thus precluded the VSSR claim. Because the defense of unilateral negligence has no applicability to the undisputed facts of this VSSR claim, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 32} Ohio Adm. Code Chapter 4121-5 sets forth specific safety requirements for workshops and factories.
 {¶ 33} Ohio Adm. Code 4121:1-5-17, "Personal protective equipment," states:
(C) Specific requirements of general application.
(1) Personal protective equipment furnished by the employer shall be issued to the employee in sanitary and proper condition so that it will effectively protect against the hazard involved.
 {¶ 34} Ohio Adm. Code 4121:1-5-17(I), "Protection of the body and exposed parts and other protective equipment," states:
(4) Working by hand on energized circuits.
When an employee is required to work on, or in proximity to, energized lines, the employer shall provide and the employee shall use protective equipment approved for the hazard involved.
 {¶ 35} Ohio Adm. Code 4121:1-5-23, "Electrical conductors and equipment," states:
(A) Unless the electrical conductors or equipment to be worked on are isolated from all possible sources of voltage or are effectively grounded, the employer shall provide protective equipment approved for the voltage involved, such as rubber gloves with protectors, rubber sleeves, hot line tools, line hose, line guards, insulator hoods, blankets, and access boards. Employees shall be instructed in the use of such tools and equipment and, when working on or when working within contact distance of an energized conductor, shall use such tools and equipment.
 {¶ 36} In State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.
(2000), 88 Ohio St.3d 190, 192, the court states that "unilateral negligence" is a defense to VSSR liability that applies only when the claimant (decedent) deliberately renders an otherwise complying device noncompliant or nonconforming. The Quality Tower court explained:
* * * Unilateral negligence derives from State ex rel. Frank Brown Sons, Inc. v. Indus. Comm. (1988), 37 Ohio St.3d 162 * * *, in which an employer was exonerated from VSSR liability because an employee had removed a part of a scaffold that had been required by a specific safety requirement. Brown held that (1) employers can be subject to VSSR penalties for "only those acts within the employer's control," and (2) a specific safety requirement does not impose a duty of "constant surveillance" just by requiring a securely and rigidly based scaffold.Id. at 164 * * *.
* * * In [State ex rel. Cotterman v. St. Marys Foundry (1989),46 Ohio St.3d 42], an employer was held liable for violating a regulation requiring sufficient chain-sling capacity for suspending overhead loads. There, a supervisory employee was killed because he selected chains too weak to suspend a huge core. Contrasting Brown, the Cotterman court held, in effect, that this specific safety requirement imposed an absolute duty of compliance notwithstanding the supervisory employee's mistake.
Brown and Cotterman are regularly cited for establishing the boundaries of the unilateral negligence defense * * *; however, the defense is not actually about an employee's negligence. The employer instead avoids VSSR liability when "[the] employee unilaterally violates a safety requirement [emphasis added]," * * * that is, when the employee removes or ignores equipment or instruction that complies with a specific safety requirement. * * * On the other hand, an employee's negligence in failing to protect himself from injury due to an employer's VSSR will never bar recovery because specific safety requirements exist to promote a safe work environment and "to protect employees against their own negligence and folly." * * * Thus, the critical issue in a VSSR claim is always whether the employer complied with the specific safety requirement. * * *
Id. at 192-193. (Emphasis sic.)
 {¶ 37} Because a VSSR results in a penalty, specific safety requirements must be strictly construed in the employer's favor. State exrel. Burton v. Indus. Comm. (1989), 46 Ohio St.3d 170. Strict construction requires that "all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer." (Emphasis added.) Id. at 172. It must be kept in mind that specific safety requirements are intended to protect employees from their own negligence, folly, and stupidity, in addition to providing them with a safe working environment. State ex rel. Blystone v.Indus. Comm. (1984), 14 Ohio App.3d 238; State ex rel. Weich Roofing,Inc. v. Indus. Comm. (1990), 69 Ohio App.3d 281.
 {¶ 38} Under Ohio Adm. Code 4121:1-5-23(A), the employer is required to provide protective equipment such as rubber gloves with protectorsunless the electrical conductors or equipment to be worked on areisolated from all possible sources of voltage or are effectively grounded.
 {¶ 39} Here, the commission erroneously found that the employer had isolated the electrical conductors from all possible sources of voltage by simply instructing decedent to always turn off the electrical power before handling the energized alligator clips. The welder tester would be reminded that the electrical power was on by the flashing lights on the testing board.
 {¶ 40} Isolation of the electrical conductors from all possible sources of voltage is clearly the duty and responsibility of the employer if the employer wants to avoid the duty to provide protective equipment. The employer cannot shift its responsibility to its employee by simply instructing its employee to isolate the electrical conductors himself prior to contacting energized conductors. To hold otherwise would give a patently unreasonable interpretation to Ohio Adm. Code 4121:1-5-23(A) that would effectively place the burden of providing a safe working environment solely upon the employee.
 {¶ 41} Strict construction does not permit the commission to give an unreasonable interpretation to its safety rules as occurred here. Stateex rel. Lamp v. J.A. Croson Co. (1996), 75 Ohio St.3d 77, 81.
 {¶ 42} While decedent apparently ignored his employer's instruction, the employer's instruction, by itself, does not satisfy the safety requirements set forth at Ohio Adm. Code 4121:1-5-23(A).
 {¶ 43} Hence, that decedent ignored his employer's safety instruction and negligently contacted the energized conductor without turning off the power, does not create the defense of unilateral negligence.
 {¶ 44} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying the VSSR application and, in manner consistent with this magistrate's decision, enter a new order that adjudicates the VSSR application.
[1] This requirement is now found at Ohio Adm. Code 4123:1-5-23(A).